IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| KATHY CANTRELL, | ) |
| | ) No. 3:03-0082 |
| v. | ) |
| | ) Judge Nixon |
| NISSAN MOTOR CORPORATION | ) |
| IN USA. | ) |

## ORDER

This case came to be heard on Tuesday, June 27, 2006. The Court heard arguments of counsel on Friday, June 30, 2006 and issues this Bench Order.

**I. Facts**

Plaintiff Kathy Cantrell ("Cantrell") filed this action against Nissan Motor Corporation in USA ("Defendant") alleging employment discrimination in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et seq. ("ADA") and retaliation. The ADA discrimination claim was dismissed at summary judgment and all that remains is Cantrell's claim for retaliation. Specifically, Cantrell asserts that Defendant initiated disciplinary proceedings against her which adversely affected her work conditions in retaliation for Cantrell filing a charge with the Equal Employment Opportunity Commission ("EEOC").

Cantrell was employed as a technician at an automobile manufacturing plant operated by Nissan in Smyrna, Tennessee from March 15, 1992 until December 6, 2002. In 1993, Cantrell's family physician diagnosed her with having depression and occasional panic attacks, and prescribed medication to treat these problems. Cantrell has taken medication and received counseling since that time. In 1994, Cantrell was hospitalized as a result of her depression for

approximately two weeks. She has not been hospitalized for depression since. Cantrell avoids crowds, but she is able to drive, attend church regularly, and take care of household chores such as cooking, cleaning and laundry. Cantrell also suffers from a sleep disorder which causes her to either sleep too little or too much. In 2002, she was permitted a one-month leave of absence from her work in order to participate in a sleep study.

Cantrell had many interpersonal problems with her co-workers, some of which became so troubling to her that in late 1998, both her personal psychologist and a Nissan doctor imposed restrictions which barred her from working with several individuals. Nissan accommodated these restrictions by assigning Cantrell only to work groups in which she would not be required to come into contact with those individuals.

On June 18, 1999, Cantrell began a leave of absence due to a non-work related knee injury. She remained on leave until December 10, 1999. When Cantrell returned, her physician place limitations on her ability to squat, crouch, and step up and down. Nissan identified a job rotation within her work group that satisfied those restrictions. On October 23, 2001, Cantrell advised Nissan that additional restrictions regarding her knee had been imposed by her doctor. Nissan contends that there was only one work group where Cantrell could work within these restrictions. Cantrell disputes this and claims that she could not work in the group identified by Nissan because it included one of the individuals with whom Cantrell was restricted from working. She was therefore put on a leave of absence. In February 2002, Cantrell's doctor submitted new restrictions, which Nissan determined could be accommodated in Cantrell's current assignment, and she returned to work.

In April 2002, it was Cantrell's turn, under Nissan's seniority system, to rotate into the

2

"Seal, System 2" unit ("Sealer"). Every other technician in her group had previously rotated into Sealer. Previously, Cantrell had avoided rotations into Sealer as a result of the restrictions concerning with whom she could work. Co-workers regarded this as unfair because Sealer is perceived to be a difficult job. On June 1, 2002, Cantrell advised the company managers that Dr. Williams had approved her to attempt to work in Sealer, and that she was willing to try to work in Sealer. Nissan medical staff evaluated her restrictions and her willingness to try to work in Sealer and agreed to permit the transfer on a temporary basis. Cantrell then began working in Sealer. In an effort to provide a more relaxed and familiar workstation, her manager, Andy Travis ("Travis"), arranged for another technician to work in Sealer across the line from Cantrell. Travis escorted Cantrell to her assigned job, and watched her perform the job for several minutes. He assured her that he would check on her periodically, and asked if she was okay before leaving, to which she responded affirmatively. However, shortly after Travis left, Cantrell began to experience another panic attack as a result of being in close proximity to her former work group, although she did not see any of the employees from whom she had been restricted. Following this incident, Nissan made no further attempt to have Cantrell work in Sealer.

Following an unrelated disciplinary problem, Cantrell was transferred to a new work group on July 31, 2003. Cantrell's new group, Sealer, System 1, did not include any of the technicians from whom she was restricted, and was in an entirely different location. However, Cantrell did not report to her new assignment but instead went on another leave of absence. Cantrell claimed that she had begun to experience another panic attack and could not work because two individuals from whom she was restricted were working in the plant where her new

assignment was located. Cantrell returned to work on November 13, 2002.

Cantrell was also the subject of numerous problems and complaints from other employees during the course of her employment. The first such problem appears to have arisen thirteen months after she began working at Nissan, when she was cited for inappropriate workplace behavior for making unwelcome physical contact with a co-worker on two separate occasions. Later, in February 1995, co-worker Angela Link complained to the paint plant's Human Resources Department that Cantrell was engaging in inappropriate physical contact and intimidating her co-workers for an extended period of time. The next month, Cantrell's then area manager, Russell Rigsby, reported that Cantrell had confided in him that she planned to murder someone, and had told him "I'm so mad I could kill someone. I could understand how someone could come into a place like this and kill people," and said, "I'm going to beat the shit out of Angela [Link] after her baby is born." Nissan then placed Cantrell on medical leave until she could demonstrate that she was not a threat.

Nissan authorized Cantrell to return to work on June 1, 1995. In August and September 1995, Cantrell was counseled by several Nissan managers about her "finger pointing, accusations, and intimidation." The next July, Ron Taylor, who was Cantrell's area manager at the time, reported that she was making sexual comments to him at work and in phone calls to his home. In October 1996, Patrick Link, Angela Link's husband, complained to Nissan that Cantrell was threatening him and others at work, and had confronted him in the parking lot. On October 25, 1996, Jim Bowles ("Bowles"), section manager for the paint plant, recommended that Cantrell be reassigned to another work group to give her a "fresh start." Management agreed and moved her to a new work group. Nissan does not normally transfer an employee to

4

give them "a fresh start," but the company believed this move would be a positive development for Cantrell, especially as her new work group was regarded as a more desirable assignment than her old one.

In November 1996, co-worker Sam Garrison reported that Cantrell intimidated, harassed, and stared at him. In January 1997, co-worker Jimmy Waisanen reported two incidents of harassing behavior by Cantrell, one toward him and another in which Cantrell called his wife. On July 18, 2002, Cantrell was again involved in an incident in which she allegedly became "argumentative" with yet another coworker. Nissan management considered terminating Cantrell, but decided against it. Instead, on July 31, 2002, Cantrell received a written reminder regarding her "inappropriate behavior." The written reminder also informed her that she would be transferred to a new work group effective immediately, and warned her that any further inappropriate behavior at any time could result in further corrective action including termination of her employment. Bowles testified that in his experience at Nissan, such a second "fresh start" was unprecedented. As noted above, Cantrell did not report to her new assignment, but instead went on another leave of absence.

While on leave, Cantrell filed a charge of discrimination with the EEOC. That charge was dismissed on October 30, 2002. Cantrell returned to work on November 13, 2002 and met with Bowles and Terry Parks ("Parks"), the Paint Operations Section manager. They informed her she was being given a second fresh start and that any further inappropriate behavior would result in her termination. Parks testified that his impression of Cantrell at the meeting was that "she handled herself well. She was a pleasant person." During her first days back, Parks would check in with Cantrell regularly to make sure things were going smoothly. In his view, Cantrell

"seemed to be very pleasant, very happy where she was working, did not really have problems, was adapting well." Moreover, her area manager told Parks that Cantrell was doing fine.

On November 18, 2002, Cantrell was asked by her supervisor if she would participate in Nissan's vehicle evaluation program, where employees look over cars as if they were at a dealership, by checking over the finish of the car, the lights, the radio, and other functions, and then test-driving the car on a track. Cantrell agreed to participate in the program, however after riding with a trainer in three cars and watching the training video, Cantrell decided she no longer wanted to participate in the program, stating at the time only that it was personal. She later testified that because the trainer displaying the video stated that an employee could be disciplined or lose her job for causing any damage to the vehicles, she became afraid she would lose her job as she had already been warned. Foxx testified that when came to pick Cantrell up from the vehicle evaluation program site she was calm and simply told him she could not longer participate for personal reasons. He took her to Human Resources, where she met with Parks and the Human Resources representative, Loretta Onwu, who determined that she should be sent to medical. Cantrell then went on a medical leave of absence.

Bowles prepared a memorandum for Charles Bramley, Department Manager, on November 25, 2002, recommending Cantrell's termination based upon her long history of inappropriate behavior and misconduct, which included attempting to pick her own jobs and not being able to get along with other employees. Nissan management, including Alvim Martin, Department Manger, Central Human Resources, Rusty Krawchuck, Plant Manager/Director, and Greg Daniels, Vice-President of Manufacturing, independently reviewed the termination recommendation and approved the termination of Cantrell. Greg Daniels testified that he did not

know of Cantrell's EEOC filing at the time he approved her termination. Bowles informed Cantrell at a meeting on December 6, 2002, that because of her history of gross misconduct s a Nissan employee, she was being terminated.

Cantrell appealed her termination through the Nissan peer review process. Cantrell's appeal before the peer review panel was heard on January 10, 2003. Cantrell and Nissan management each submitted a written statement to the peer review panel. The panel also heard from both Cantrell and representatives of Nissan management pertaining to the termination decision. Following its deliberations, Cantrell's peer review panel upheld her discharge.

**II.   Analysis**

In order to prove a case of unlawful retaliation, a plaintiff must show by a preponderance of the evidence: 1) that she engaged in a Title VII-protected activity; 2) that her employer knew of that activity; 3) that she experienced an adverse employment action; and 4) that a causal connection exists between the protected activity and the adverse employment action. Little v. BP Exploration & Oil Co., 265 F.3d 357, 363 (6th Cir. 2002).

There is no dispute that Cantrell engaged in a protected activity by filing a claim of discrimination with the EEOC on September 5, 2002, that Nissan was aware of this activity, or that Cantrell experienced an adverse employment action when she was terminated on December 6, 2002. The only dispute is whether Cantrell has shown by a preponderance of the evidence that there was a causal connection between her EEOC filing and her termination.

A causal connection is established by the presentation of evidence "sufficient to raise the inference that her protected activity was the likely reason for the adverse action." EEOC v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1990). While "no one factor is dispositive in

7

Case 3:03-cv-00082   Document 80   Filed 06/30/06   Page 7 of 12 PageID #: 161

establishing a causal connection," the Sixth Circuit has held that evidence that a defendant employer treated a plaintiff employee differently from identically situated employees who did not engage in protected activity is relevant. Allen v. Michigan Dept. Of Corrections, 165 F.3d 405, 413 (6th Cir. 1999). Applying similar logic, the Sixth Circuit has implied that where an employer treats an employee differently after she asserts her rights under the ADA than before, a retaliatory motive may be inferred. See Walborn v. Erie County Care Facility, 150 F.3d 584, 589 (6th Cir. 1998). Finally, "[a]lthough temporal proximity alone does not support an inference of retaliatory discrimination in the absence of other evidence, closeness in time between the filing with the EEOC and the adverse employment action is relevant and may evince the employer's intent." Johnson v. University of Cincinnati, 215 F.3d 561, 582 (6th Cir. 2000).

The facts of Cantrell's career at Nissan show that for years Nissan tolerated Cantrell's inability to get along with her co-workers, reflected in incidents in which she made threats of unwanted physical contact with others, and that Nissan countenanced what it perceived as Cantrell's attempts to "pick her jobs" by invoking her restrictions to avoid certain assignments. It was only after Cantrell's return to work in November 2002, having filed her EEOC charge two months earlier while on leave that Nissan determined that her "history of gross misconduct" required her termination. Because Cantrell filed the complaint while on leave (thus presumably making it difficult for Nissan to fire her at that time), the Sixth Circuit concluded that the appropriate measure of temporal proximity in this case is from November 13, 2002, the date that she first returned to work after filing the EEOC complaint, until the date of her termination on December 6, 2002. Consequently, the Sixth Circuit found that Cantrell raised an inference that her termination may have been retaliatory for the filing of her EEOC complaint.

In order for Defendant to rebut Plaintiff's inference of retaliation, Defendant must establish a legitimate nondiscriminatory purpose for the adverse employment action taken. Defendant has provided evidence of numerous instances of Cantrell's past inappropriate behavior. Defendant also gave Cantrell a written warning in July 2002, that she would be terminated if she participated in any future inappropriate behavior. Defendant then reminded her of that written warning just six days before she refused to perform her job duties. Given this past history of inappropriate behavior and warnings, if Defendant believed that Cantrell violated any rules, then it had a legitimate nondiscriminatory reason for firing her. Importantly, the issue here becomes whether Defendant believed that Cantrell was having a panic attack at the time that she decided not to fulfil her job duties and participate further in the vehicle evaluation program. If Defendant did not, then Defendant legitimately terminated Cantrell for refusing to do her job, after she had been warned that any further inappropriate behavior would lead to her termination.

Mr. Foxx, Cantrell's supervisor at the time, testified that when he came to pick Cantrell up from the Vehicle Evaluation Program she was calm and simply told him she could not drive the cars and that it was personal. He testified that she did not cry or appear upset, and that he dropped her off at the human resources office. In an email Ms. Loretta Onwu, the Human Resources representative, stated that Cantrell told her the reason she could not drive the cars was because she was afraid she might have a panic attack. Furthermore, testimony from Mr. Bowles and Mr. Krauchuk reveal their disbelief that Cantrell was having a panic attack at the time she made the decision not to perform her job duties. Indeed, the testimony reveals that various Nissan managers felt that on the night of November 18, Cantrell did not have a panic attack at all, but for fear of losing her job, decided she did not want to drive cars.

9

The Court finds it is likely that Cantrell had a panic attack, as she was subsequently put on medical leave. However, the Court also finds that Defendant did not believe this attack started prior to Cantrell's decision not to work. Therefore, Defendant believed that the panic attack had no impact on Cantrell's decision not to work. As a result, Nissan managers, who were now closely watching Cantrell given her past history of inappropriate behavior, believed that Cantrell was again attempting to pick and chose which job she wished to perform by refusing to participate in the VEP. Nissan determined that this was a serious rule violation, and given Cantrell's recent warnings and past history, decided to terminate Cantrell's employment.

As Defendant has succeeded in establishing a legitimate nondiscriminatory purpose for the adverse employment action taken, in order to prove her case Cantrell must then demonstrate "by a preponderance of the evidence that the defendant's stated reasons are pretextual." Id. at 552. In order to show that a proffered legitimate, non-discriminatory reason for an adverse employment action is pretextual, a plaintiff must show "either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge." Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (quoting McNabola v. Chicago Transit Authority, 10 F.3d 501, 513 (7th Cir. 1993). It is clear that Cantrell cannot prove pretext either by showing that the proffered reasons had no basis in fact or that they were insufficient to motivate discharge. She must instead show that the proffered reasons did not actually motivate her discharge. In other words, she must show "circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant." Id.

As the Court has discussed above, Cantrell's claim of pretext is implausible because the

Court found that Defendant did not believe that Cantrell suffered from a panic attack at the time that she made the decision to stop performing her job duties. As a result, Defendant saw Cantrell's refusing to perform her job functions as a rule violation. Given Cantrell's past warnings, Defendant legitimately terminated her for this rule violation.

In addition, Nissan has a comprehensive protocol that must be followed in order to terminate any employee. This protocol includes the requirement that various members of Nissan's management read the reasons for termination and sign it in agreement with the decision. The final person to sign off on Cantrell's termination packet was Vice-President of Manufacturing, Mr. Greg Daniels. Daniels testified that at the time he read and signed Cantrell's termination packet, he was unaware that she had filed any complaint with the EEOC. Therefore, his decision to approve her termination could in no way have been affected by the exercise of Plaintiff's rights under Title VII. Moreover, Nissan has an appeals process whereby terminated employees have the option of a review of their termination by a peer review group. Cantrell availed herself of this process, and the peer review group affirmed Defendant's decision to terminate Cantrell. Consequently, the Court finds that Nissan's stated legitimate nondiscriminatory reasons for terminating Plaintiff were not pretextual.

### III. Conclusion

The Court finds that Nissan did not terminate Cantrell because of her EEOC filings, but instead because of her past history of misconduct combined with a final attempt to pick her job, by deciding not to complete the vehicle evaluation program. Therefore, Plaintiff's claim of retaliation is DENIED and this case is DISMISSED.

It is so ORDERED.

Entered this the ___30th___ day of ___June___, 2006.

                                            _/s/ John T. Nixon_
                                            JOHN T. NIXON, SENIOR JUDGE
                                            UNITED STATES DISTRICT COURT